1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| TILLIE HARDWICK, et al., | Case Number C 79-1710 JF (PVT) |
| Plaintiffs | ORDER DENYING THE TRIBE'S MOTION FOR ENFORCEMENT OF JUDGMENT |
| v. | |
| UNITED STATES OF AMERICA, et al., | [re: doc. no. 297] |
| Defendants. | |

20    Non-party Picayune Rancheria of Chukchansi Indians ("the Picayune Rancheria" or "the

21  Tribe") moves for enforcement of the Stipulated Judgment entered in this action in 1987.  The

22  motion is opposed by Defendant County of Madera ("Madera County").  The Court has

23  considered the briefing of the Tribe and of Madera County, as well as the oral arguments

24  presented at the hearing on December 1, 2006.  For the reasons discussed below, the motion will

25  be denied.

26                                    **I BACKGROUND**

27    This is the second time that the Tribe and Madera County have appeared before this Court

28  to litigate the effect of the 1987 Stipulated Judgment entered in this action by then-assigned

1  District Judge Spencer Williams.  The relevant historical and procedural facts are as follows:

2  **1987 Stipulated Judgment**

3      In the 1950s, the United States took steps to terminate the existence of a number of Indian

4  tribes and abolish federal programs available to them as a result of their special status.  Under the

5  California Rancheria Act of 1958 ("Rancheria Act"), the United States purported to terminate the

6  existence of forty-one California Indian tribes, distributing tribal property to individual tribe

7  members ("distributees").  Upon distribution of tribal property, the tribes ceased to exist and the

8  members of the former tribes were stripped of their status as Indians.  Tribal lands, which had

9  been held in trust and exempted from state taxation and regulatory laws, were transformed into

10  parcels held in fee simple by the distributees.  These lands thus became subject to state and local

11  laws.

12      In 1979, individuals from thirty-four of the terminated tribes commenced the instant

13  litigation.  The individuals sought restoration of their status as Indians and entitlement to federal

14  Indian benefits, as well as the right to reestablish their tribes as formal government entities.  The

15  litigation was certified as a class action.

16      In 1983, the litigation was settled with respect to the members of seventeen former tribes,

17  including the Picayune Rancheria.  Judge Williams entered a "Stipulation For Entry Of

18  Judgment" ("1983 Stipulated Judgment") providing among other things that "[t]he status of the

19  named individual plaintiffs and other class members of the seventeen rancherias named and

20  described in paragraph 1 as Indians under the laws of the United States shall be restored and

21  confirmed."  This judgment further provided that "[t]he Secretary of the Interior shall recognize

22  the Indian Tribes, Bands, Communities or groups of the seventeen rancherias listed in paragraph

23  1 as Indian entities with the same status as they possessed prior to distribution of the assets of

24  these Rancherias under the California Rancheria Act, and said Tribes, Bands, Communities and

25  groups shall be included on the Bureau of Indian Affairs' Federal Register list of recognized

26  tribal entities pursuant to 25 C.F.R., Section 83.6(b)."  The 1983 Stipulated Judgment also

27  provided a mechanism by which individuals holding former tribal lands could reconvey the lands

28  to the United States to be held in trust.

2

1  Several tribes took immediate action to reestablish their tribal governments and formally
2  intervene in the instant litigation.  The Picayune Rancheria was not one of the intervening tribes
3  and in fact took several years to reorganize its tribal government.  Its first formal meeting for this
4  purpose was held in August 1986.  There were serious internal disputes over control of the Tribe.
5  Two factions submitted separate Tribal Constitutions for BIA approval, both of which were
6  rejected for failure to obtain General Council approval.  The Tribe as a whole finally adopted a
7  Tribal Constitution on November 7, 1988.
8  In 1987, while the Tribe was reorganizing its government, questions arose as to the
9  boundaries of the Picayune and North Fork Rancherias, both located in Madera County, and as to
10  tax consequences flowing from the termination and later restoration of these two tribes.  Judge
11  Williams entered the subject 1987 Stipulated Judgment addressing these issues.  The 1987
12  Stipulated Judgment specifically identified the Picayune Rancheria as a named plaintiff, although
13  as discussed above the Tribe had not yet reorganized its tribal government and had not intervened
14  in the action.  The 1987 Stipulated Judgment confirmed the boundaries of the Picayune and
15  North Fork Rancherias and stated that:  the Picayune and North Fork Rancherias had not been
16  lawfully terminated; the Picayune and North Fork Rancherias would be treated as any other
17  federally recognized Indian Reservation; all real property taxes paid to Madera County on
18  "Indian Parcels" for the tax years 1979 and thereafter would be refunded; and Madera County
19  would not collect any future property taxes on "Indian Parcels" within the boundaries of the
20  Picayune and North Fork Rancherias *except* that after December 31, 1988, Madera County would
21  have limited power to collect *ad valorem* property taxes on "Indian Parcels" as to which no
22  election to return to trust status had been made.  The term "Indian Parcel" was defined as
23  follows:

24  all those parcels of real property or interests in said parcels within the boundaries
   of the North Fork and Picayune Rancherias currently owned by Indians entitled to
25  return said parcels or interests thereof to the United States of America in
   accordance with the Judgment of the United States District Court, Northern
26  District of California, in the above-entitled case.

27  The term "Indians" was defined as "any Indian who owns any interest in a North Fork or
28  Picayune Rancheria parcel."

3

1    These provisions appear to have been designed to provide an equitable remedy with

2    respect to the tax consequences of the Rancheria Act.  Taxes paid on what once were tribal lands

3    were refunded, and holders of those lands were given a grace period within which to return the

4    lands to trust status (in which case no future tax consequences would arise).  Indian Parcels

5    subject to these provisions and not returned to trust status by the end of 1988 would be subject to

6    *ad valorem* property taxes.

7        **Prior *Ad Valorem* Taxes Dispute**

8        At the time the 1987 Stipulated Judgment was entered, there were seven parcels of land

9    within the boundaries of the Picayune Rancheria.  One was held by an Indian, Maryan Ramirez,

10   who already had returned the parcel to trust status.  The other six parcels were owned in fee by

11   non-Indian individuals.  The Tribe, seeking to reestablish its reservation lands, began purchasing

12   these six parcels approximately eight years later in 1995, and acquired the last of them in 2002.

13   The Tribe holds all six later-acquired parcels in fee simple.[1]  In June 2003 the Tribe completed

14   construction of a resort and casino facilities on the property ("the Resort").  Based upon these

15   completed improvements, Madera County performed a reassessment of the property and

16   concluded that the Tribe had an estimated annual *ad valorem* property tax liability of

17   approximately $4.1 million.  The Tribe disputed this estimate and took the position that there was

18   no tax liability.

19       Madera County brought a motion in this Court for enforcement of judgment.  The Court

20   denied Madera County's motion on May 20, 2004, based in part upon the Court's conclusion that

21   the Tribe was not bound by the 1987 Stipulated Judgment.  In particular, the Court concluded

22   that because the Tribe had not yet reorganized at the time the 1987 Stipulated Judgment was

23   entered; that as a result the Tribe could not have been a party to this action or to the 1987

24   Stipulated Judgment; and that the Tribe thus had not waived its sovereign immunity.  The Court

25   concluded further that even if the Tribe were bound by the 1987 Stipulated Judgment, that

26

27       [1] It appears that the Tribe submitted an application to have the six parcels returned to trust
28   status in March 2003; the record is unclear as to the status of this request, but it does not appear
     that the land has been returned to trust.

4

1   judgment did not authorize the imposition of the *ad valorem* taxes at issue.  The Court denied

2   Madera County's motion for reconsideration on October 13, 2004.

3         Madera County did not appeal the Court's decision, but instead filed an *in rem* action in

4   Madera County Superior Court on October 25, 2004.  The action seeks declaratory relief as to the

5   taxability of the land owned in fee by the Tribe.  Litigation of the state action was delayed several

6   times while the Tribe and Madera County attempted to reach a settlement.  Those efforts failed,

7   and the Tribe's motion to quash or dismiss the *in rem* complaint was heard on October 6, 2006

8   and on December 1, 2006.  The record does not indicate the status of that motion.  However, the

9   parties clarified at the hearing that the *in rem* action is limited to Madera County's ability to tax

10  the Tribe's land, and does not encompass the County's ability to impose state environmental or

11  other regulatory laws with respect to the Tribe's land.

12  **Instant Dispute**

13        The Tribe recently decided to expand the Resort to add greater amenities, such as an

14  additional 204 hotel rooms, a weight room and spa facility, additional parking facilities, and

15  improved waste water treatment plant, a warehouse storage facility and a children's area.  Prior to

16  beginning this expansion, the Tribe prepared an issued an Environmental Evaluation ("EE")

17  pursuant to the Tribal-State Compact between the Tribe and the State of California ("the

18  Compact").  The Tribe also held public hearings and provided Madera County with an

19  opportunity to provide input.  The Tribe then responded to the input of the public and of Madera

20  County, which response included an analysis of environmental impacts that required mitigation

21  under the Compact.

22        On September 1, 2006, the Tribe received a letter from Rayburn Leach of Madera

23  County's planning department and David Prentice of Madera County's office of county counsel.

24  The letter asserted for the first time that the California Environmental Quality Act ("CEQA")

25  governed the Resort expansion and advised that no permits would be issued without an

26  appropriate Environmental Impact Report under CEQA.  The letter advised further that the

27  decision could be appealed to the Board of Supervisors and that any construction activities

28  without a permit would result in a stop work order.  With respect to the fact that Madera County

5

1   had never raised CEQA requirements in connection with the construction of the original Resort

2   facilities, the letter stated that "CEQA should have governed." The Tribe asserts that in addition

3   to the September 1 letter, Madera County has threatened to "red tag" the expansion project,

4   meaning that the County will take adverse action against any contractor working on the project.

5        The Tribe brought the instant motion to enforce judgment, asserting that it is an intended

6   third party beneficiary of the 1987 Stipulated Judgment. Madera County argues that the Tribe is

7   not an intended third party beneficiary and lacks standing to move for enforcement of the 1987

8   Stipulated Judgment, and that in any event the 1987 Stipulated Judgment does not preclude the

9   County from enforcing state health and safety laws on the Tribe's fee-owned land.

10        On November 21, 2006, after the Tribe filed the instant motion but before it was heard,

11   Madera County filed a second state court action in Madera County Superior Court seeking to

12   restrain the Tribe from proceeding with the expansion of the Resort. The Tribe immediately

13   removed that action to the Eastern District of California, where it remains pending.

14                                          **II. DISCUSSION**

15        As was discussed at length on the record at the hearing, the Court is not persuaded that a

16   motion to enforce judgment is the proper vehicle for the Tribe's arguments. The Court

17   specifically has held that the Tribe is *not* a party to the 1987 Stipulated Judgment. The Tribe

18   nonetheless asserts that it has standing to bring a motion to enforce judgment pursuant to Federal

19   Rule of Civil Procedure 71, which provides in relevant part that "[w]hen an order is made in

20   favor of a person who is not a party to the action, that person may enforce obedience to the order

21   by the same process as if a party." The Ninth Circuit has held expressly that "intended third-

22   party beneficiaries of consent decrees have standing to enforce those decrees." *Floyd v. Ortiz*,

23   300 F.3d 1223, 1226 (9th Cir. 2002).

24        It is not clear whether the Tribe is a third party beneficiary to the 1987 Stipulated

25   Judgment. However, even assuming without deciding that the Tribe *is* an third party beneficiary

26   of that judgment, the judgment does not address the issue raised by the Tribe's motion, namely

27   whether Madera County may enforce state environmental laws with respect to the Tribe's

28   expansion of its Resort. The Tribe's arguments on this point are grounded in part upon its

                                              6

contention that the 1987 Stipulated Judgment conclusively establishes the lands at issue as "Indian Country," but also are grounded in federal law, the Compact, the Memorandum of Understanding between the Tribe and Madera County, and the County's alleged waiver of jurisdiction over the Resort. These matters go far beyond the scope of the 1987 Stipulated Judgment, and thus more properly should be addressed in a new action for declaratory relief. Accordingly, the Court will deny the Tribe's motion for enforcement of judgment without prejudice to the Tribe's filing of a declaratory relief action. In the event that the Tribe does file a declaratory relief action, it shall file a notice of related case so that such declaratory relief action may be related to the instant action.

### III. ORDER

The motion for enforcement of judgment is DENIED.

DATED:  12/6/06

_____
JEREMY FOGEL
United States District Judge

Case No. C 79-1710 JF (PVT)
ORDER DENYING THE TRIBE'S MOTION FOR ENFORCEMENT OF JUDGMENT
(JFLC2)

1  Copies of Order served on:

2

3  Counsel for the Tribe:

4  Christina V. Kazhe
   Michael A. Robinson
5  Monteau & Peebles LLP
   1001 Second Street
6  Sacramento, CA 95814

7  Counsel for Madera County parties:

8  Dennis M. Cota
   Steven M. Ingram
9  Samuel L. Emerson
   Best Best & Krieger LLP
10 400 Capitol Mall, Suite 1650
   Sacramento, CA 95814

11
   David A. Prentice
12 County Counsel
   County Counsel of Madera
13 333 West Olive Avenue
   Madera, CA 93637

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8